COMMONWEALTH *v.* BOBBY JOE LEASTER.

Suffolk.    May 1, 1972. — September 5, 1972.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & HENNESSY, JJ.

*Identification.  Evidence,* Hearsay, Of identification, Corroborative
    evidence, Presumptions and burden of proof.  *Practice, Criminal,*
    Charge to jury.

Admission of an out-of-court identification of the defendant in a mur-
    der case by the victim's wife at a time when she was leaving a
    hospital in which her husband had died after being shot and
    when the defendant, who was without counsel, was being trans-
    ferred from one police vehicle to another, was not so suggestive
    as to deny the defendant due process of law where the confronta-
    tion happened accidentally, very soon after the shooting, while
    the police were trying to arrange a legitimate bedside confronta-
    tion with the dying victim.  [409–411]
Testimony by police officers in a murder case that the victim's wife
    had stated that she recognized the defendant as the man who
    shot her husband was properly admitted under a limiting instruc-
    tion to the jury that it be considered only to corroborate the fact
    that the victim's wife did make the identification as she had pre-
    viously testified and not as proof of the truth of the identification
    itself.  [411–412]
At a trial for murder by shooting in the course of robbery of a store,
    in-court identifications of the defendant by two different witnesses
    after impermissibly suggestive out-of-court identifications by them
    were admissible where the Commonwealth established by clear and
    convincing evidence that the in-court identifications were based
    upon observations of the defendant during the robbery.  [412–415]
Certain instructions to the jury in a murder case with respect to alibi
    evidence, taken in conjunction with an instruction that alibi evi-
    dence should be scrutinized carefully because it could be easily
    fabricated, did not impermissibly shift any burden of proof to the
    defendant or show any likelihood that the jury were led to ignore
    the Commonwealth's burden of proof where the judge also stated
    that the Commonwealth had the obligation of proving every ele-
    ment of the crime beyond a reasonable doubt and that if the jury
    believed the defendant's alibi the Commonwealth would have
    failed to meet its burden.  [416–417]

INDICTMENTS found and returned in the Superior
Court on November 13, 1970.

The cases were tried before McLaughlin, C.J.

*William P. Homans, Jr.  (Charles H. Lewis, Jr.,* with
him) for the defendant.

*Alfred E. Saggese, Jr.*, Assistant District Attorney (*Alvan Brody* with him) for the Commonwealth.

BRAUCHER, J.   The defendant was found guilty of first degree murder, armed robbery, and assault and battery by means of a dangerous weapon, and was sentenced concurrently to life imprisonment and terms of years.   He appeals under G. L. c. 278, §§ 33A–33G, assigning as error (1) the admission in evidence of an out-of-court identification, (2) the admission in evidence of hearsay, (3) the admission in evidence of in-court identifications, and (4) the judge's instruction to the jury on the defence of alibi.

We summarize the evidence submitted to the jury. Kathleen and Levi Whiteside operated a variety store (the store).   At approximately 4 P.M. on September 27, 1970, while Kathleen was behind the counter, two men entered the store.   Levi was in the back room.   One of the men ran behind the counter, held a gun to Kathleen's head and told her to open the cash register.   Levi came from the back room to his wife's assistance and was shot by that man.   The two men fled the store with about $200 from the cash register.   A customer, Nellie Rivera, was in the store during the robbery.

The police came about 4:25 P.M. and found Levi bleeding on the floor.   He was taken to Boston City Hospital, where he died at 4:30 P.M.   A description of the two men was obtained from Kathleen and sent out on the police radio.   At 5:15 P.M. the defendant was arrested because he fitted the description of the man who shot Levi.   The arresting officer took the defendant to the hospital.

The defendant arrived at the hospital at 5:25 P.M. and was transferred to another police vehicle in the parking lot.   At this time Kathleen was leaving the hospital, and she identified the defendant as the man who shot her husband.   Both Kathleen and Nellie Rivera also made in-court identifications of the defendant as the man who shot Levi.   There was testimony by the defendant that he had been at home at the time of the

crime, corroborated by testimony from a woman with whom he was living at that time.

1. *The out-of-court identification.* After a voir dire hearing the judge excluded from evidence identifications of the defendant made in a police station by Kathleen and Mrs. Rivera about 6 P.M. and 7 P.M. respectively on the day of the crime, but admitted in evidence Kathleen's identification in the hospital parking lot. The defendant argues that the latter ruling was error, maintaining that the parking lot confrontation took place in impermissibly prejudicial circumstances while he was in custody and without counsel in violation of his right to due process of law. We summarize the relevant evidence.

Immediately after the arrest, the arresting officer, a Boston Division 4 policeman named Frost, took the defendant in a Division 4 police wagon to the hospital, about a three minute drive from the place of arrest. He testified that he did so at the direction of the police radio dispatcher in order to meet the Division 3 policeman, Sergeant Downey, "who was in charge of the case," and to transfer the defendant to the Division 3 police, since the shooting had occurred within their area. Frost did not know at the time whether Levi Whiteside was dead or alive, and testified that he did not intend a bedside identification. At the hospital, Frost saw a Division 3 police car with two other officers in it. He took the defendant "over to District 3's car and put him in District 3's car." The defendant was without counsel.

At this moment Kathleen came out of the emergency room door of the hospital with Sergeant Downey. She had gone to the hospital with the police and had stayed until the doctor had pronounced her husband dead. The emergency door was approximately thirty to forty feet from the Division 3 police car. The time was approximately 5:25 P.M., and it was daylight. Kathleen testified that she saw the police transferring the defendant from the Division 4 police wagon to the Division 3 police car and that she told Downey: "'That look like the man that

killed my husband,' so I says, 'Do you mind could I take a better look, please, a closer look, please?' So he says, yes. So he walked me over to the car . . . and it was him. I says 'Yes, this is the man that shot my husband.'" When Kathleen reached the car the defendant was in the back, and she looked in the rear window. The testimony of Downey, Frost and Kathleen as to these details of the confrontation was consistent except that Downey and Frost testified that Downey had said nothing to Kathleen at the time.

The judge found as a fact "based upon pure inference that the reason Frost was told to take the suspect [defendant] to the Boston City Hospital was in order to arrange a face-to-face confrontation with the victim, Levi Whiteside," that neither Frost nor police headquarters knew Levi was dead, and that the confrontation in the parking lot "was not pre-arranged. The police had no plans for a confrontation or identification of the suspect by Mrs. Whiteside."

The confrontation occurred after the decisions in *United States* v. *Wade,* 388 U. S. 218, *Gilbert* v. *California,* 388 U. S. 263, and *Stovall* v. *Denno,* 388 U. S. 293, and before the decision in *Kirby* v. *Illinois,* 406 U. S. 682. The evidence supports the judge's findings that the confrontation was an accident which occurred in an effort to arrange a legitimate bedside confrontation with a dying victim. See *Commonwealth* v. *Connolly,* 356 Mass. 617, 623–624, cert. den. sub nom. *Connolly* v. *Massachusetts,* 400 U. S. 843; *Stovall* v. *Denno,* 388 U. S. 293, 302. "That an eyewitness accidentally confronts a suspect erases any problem of illegality where the police make no attempt to elicit improperly such an identification." *Commonwealth* v. *D'Ambra,* 357 Mass. 260, 263. See *Kirby* v. *Illinois,* 406 U. S. 682, 698, n. 5; *United States* v. *Pollack,* 427 F. 2d 1168, 1169 (5th Cir.) ; *United States* v. *Seader,* 440 F. 2d, 488, 496 (5th Cir.) ; *People* v. *Logan,* 25 N. Y. 2d 184, 193, cert. den. sub nom. *Logan* v. *New York,* 396 U. S. 1020. This "chance meeting" was "neither avoidable, unfair, nor

suggestive." *Allen* v. *Moore,* 453 F. 2d 970, 974 (1st Cir.). If Downey had acted, as suggested by defence counsel, to prevent Kathleen from crossing the parking lot the effect would have been suggestive.

In addition, the confrontation occurred less than one and one-half hours after the shooting and was "in the course of (or immediately following) a criminal episode." *Commonwealth* v. *Bumpus,* 354 Mass. 494, 501, cert. den. sub nom. *Bumpus* v. *Massachusetts,* 393 U. S. 1034. Even before *Kirby* v. *Illinois, supra,* we held the *Wade-Gilbert per se* exclusionary rule inapplicable to such a confrontation. Evidence of the identification is admissible where, as in this case, the confrontation was in "the totality of the circumstances" not "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny due process of law. *Commonwealth* v. *Bumpus, supra,* at 499–501, citing *Stovall* v. *Denno,* 388 U. S. 293, 302. *Commonwealth* v. *Connolly,* 356 Mass. 617, 623–624. *Commonwealth* v. *Breen,* 357 Mass. 441, 446–447; *Commonwealth* v. *Gray,* 357 Mass. 771. *Commonwealth* v. *Stroud,* 361 Mass. 870. See *Kirby* v. *Illinois,* 406 U. S. 682, 698, n. 5; *United States* v. *Davis,* 399 F. 2d 948, 950–952 (2d Cir.), cert. den. sub nom. *Davis* v. *United States,* 393 U.S. 987; *Russell* v. *United States,* 408 F. 2d 1280, 1284–1285 (D. C. Cir.), *cert. den.* 395 U. S. 928; *United States ex rel. Springle* v. *Follette,* 435 F. 2d 1380, 1382–1383 (2d Cir.), cert. den. sub nom. *Springle* v. *Zelker,* 401 U. S. 980.

2. *The admission of hearsay evidence.* The defendant assigned as error the admission of testimony by Downey and Frost concerning remarks made by Kathleen to them at the time of the hospital parking lot identification and out of the hearing of the defendant. Downey testified that Kathleen told him, while going from the hospital to the parking lot, "that looks like the man who shot my husband. Can I go over and have a better look?" He also testified that on reaching the car she said, "That is the man who shot my husband. I recognize the mark under his eye." Frost testified that when

Kathleen arrived at the car she said, "That's the man that shot my husband."

Even though the evidence was hearsay as to the truth of the identification of the defendant as the man who shot Levi, it was properly admitted. Kathleen had previously testified to the identification and we have held that testimony to be admissible. The evidence disputed here was admitted under a limiting instruction to the jury that it be considered only to corroborate the fact that Kathleen did at that time and place make the identification, not as proof of the truth of the identification itself. See *Glassman* v. *Barron,* 277 Mass. 376, 382; *Commonwealth* v. *Locke,* 335 Mass. 106, 112; *Commonwealth* v. *McGrath,* 351 Mass. 534, 539; *National Labor Relations Bd.* v. *G. W. Thomas Drayage & Rigging Co. Inc.* 206 F. 2d 857, 860 (9th Cir.) ; *Allen* v. *D'Ercole Constr. Co. Inc.* 104 R. I. 362, 369; Leach and Liacos, Massachusetts Evidence, p. 184; Wigmore, Evidence (3d ed.) § 1361.

3. *The in-court identifications.* The defendant argues that the in-court identifications by Kathleen and Mrs. Rivera were tainted by impermissible out-of-court identifications. We summarize the evidence at the voir dire hearing concerning the two station house confrontations.

Both confrontations took place in the guardroom of the same police station when the defendant was without counsel. The first occured when Kathleen arrived at the station with Downey, about 6 P.M. on the day of the shooting. Downey "escorted" her into the guardroom where she saw the defendant. Downey first testified that neither he nor Kathleen had said anything at the time, but that she had told him "later on" that the "man in the guardroom was the man who had shot her husband." On cross-examination he testified that he asked her when he entered the guardroom, "Is that the man?" and that she had replied in the affirmative. Downey also said that there were three or four uniformed police officers in the guardroom, that he did not believe the defendant was the only civilian, and that

he could not remember if the defendant was the only colored man. The judge found that the defendant was "probably the only civilian and probably the only colored male in the guardroom," that the confrontation "was completely accidental" and not "engineered" by the police, but that the confrontation was impermissibly suggestive.

The second confrontation occured about 7 P.M. on the day of the crime when Mrs. Rivera was brought to the station at Downey's direction. She was brought by the police into the guardroom, saw the defendant sitting there, and identified him as the man who shot Levi. She testified that he was the only person she saw in the guard-room except the police officers. Downey testified that he was surprised to find the defendant there, that he thought the defendant had been booked and placed in a cell, and that the confrontation was not prearranged. The judge found that the defendant was "alone in a guard room in a police station, obviously under custody, with the presence of six or seven police officers in uniform, which I think is sufficiently suggestive as to be a denial of due process."

The judge made further findings, however, that the in-court identifications by Kathleen and Mrs. Rivera were of independent origin from any out-of-court confrontations after the crime. We summarize the relevant evidence. Both Mrs. Rivera and Kathleen testified that they had the opportunity to observe closely the man who killed Levi during the robbery. Mrs. Rivera testified that she looked him "straight in his face" from a distance of ten to fifteen feet for a period of about two to three minutes, and that her eyes were good. She noticed that he had on green pants, a black shirt, a black hat, that he was five feet nine to six feet in height and that he had a mark on the left side of his face under his left eye. This description was the same as the one she gave the police at the store, except she did not mention the mark at the store. She testified that there was no doubt in her mind that the defendant was

the man who shot Levi and that her conclusion was based on what she saw at the store, not at the police station. The judge found that Mrs. Rivera "had ample opportunity to observe the man who was in the store and committed the fatal act, that she was staring at him face to face for a period of at least three minutes, . . . that she impressed upon her mind his physical characteristics, and particularly his . . . dress," that she had testified that her in-court identification "has its primary origin in what she saw at the time the act is alleged to have taken place," and that her in-court identification was "not tainted by reason of an illegal out-of-court identification."

Kathleen testified that, for approximately seven minutes during the robbery, she was "face to face" with the man who shot Levi, that she had also seen him and his companion in the store about two or three days before the crime, and that they had been in the store for about one-half hour on the morning of the crime. On the morning occasion Kathleen observed them closely from "not even ten feet" away and "was wondering why they kept hanging around," and she expressed suspicion of them to her husband. She testified that her husband's assailant was wearing green pants, a black shirt, a black "droopy" hat, and white and black "sneakers," that he had a scar under his left eye, and that he was "tall." This description was the same as she gave the police at the store, except that the police description gave the hat as being a "black beret" or a "scully cap" and she did not mention the mark under the eye until later.

The judge found that Kathleen had seen the defendant twice prior to the crime and on one occasion "was paying more than casual attention" to him, that at the robbery she "was within no more than a foot of him and continued to be in his presence for at least some few minutes," that she "had an abundance of opportunity and did in fact carefully scrutinize both of the young men who were in the store in the morning and afternoon,"

that she "fixed into her mind a mental description of their physical characteristics and their clothing and attire," and that any in-court identification by Kathleen "has its primary origin in the observations which she made at the time" of the shooting, and "is based upon substantial evidence" with "little if any conflict in her story which would make it suspect."

There was evidence that on arrest the defendant was wearing green pants, a black shirt, a black hat "like the old scully, except it's bigger," and sneakers. The judge made a finding that the defendant's clothes on arrest "fitted precisely the description of the alleged assailant" given at the store. At the time of the trial the defendant had a mark under his left eye. There is no evidence that either Kathleen or Mrs. Rivera ever failed to identify the defendant.

In finding that the in-court identifications were not tainted by the pre-trial confrontations the judge impliedly found that the confrontations were not " 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' *Simmons* v. *United States*, 390 U. S. 377, 384." *Commonwealth* v. *McGrath*, 361 Mass. 431, 436–437. See *Stovall* v. *Denno*, 388 U. S. 293, 301–302; *United States ex rel. Phipps* v. *Follette*, 428 F. 2d 912, 914–915 (2d Cir.). Those findings, which are warranted by the evidence, fully support the admission in evidence of the in-court identifications. The Commonwealth established "by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than" the out-of-court confrontations. *United States* v. *Wade*, 388 U. S. 218, 240.[1]

[1] See *Commonwealth* v. *Robinson*, 355 Mass. 620, 621–622; *Commonwealth* v. *Bell*, 356 Mass. 724; *Commonwealth* v. *Frank*, 357 Mass. 250, 253–254; *Commonwealth* v. *Balukonis*, 357 Mass. 721, 725, denial of habeas corpus affirmed, *Allen* v. *Moore*, 453 F. 2d 970 (1st Cir.); *Commonwealth* v. *Royce*, 358 Mass. 597, 599–600; *Commonwealth* v. *Wilson*, 360 Mass. 557, 561; *Commonwealth* v. *Tempesta*, 361 Mass. 191, 195; *Commonwealth* v. *McGrath*, 361 Mass. 431, 434–438; *Commonwealth* v. *Ross*, 361 Mass. 665, 675–676; *Commonwealth* v. *Roberts*, ante, 357, 363–365. Compare *Commonwealth* v. *Guillory*, 356 Mass. 591, 593–594; *Commonwealth* v. *Kazonis*, 356 Mass. 649, 653; *Commonwealth* v. *Teta*, 358 Mass. 814; *Commonwealth* v. *Mendes*, 361 Mass. 507, 511–512.

4. *The alibi charge.* The defendant argues that the judge's instructions to the jury put the burden of proving the alibi defence on the defendant or left the jury confused as to where the burden of proof lay in violation of his right to due process of law. The defendant admits that the instructions were "an improvement" over those given in the case of *Commonwealth* v. *Webster,* 5 Cush. 295, 319, 324, and that they did not in express terms put the burden of proof on him. Compare *Johnson* v. *Bennett,* 393 U. S. 253, 254–255; *Stump* v. *Bennett,* 398 F. 2d 111, 115–123 (8th Cir.), cert. den. sub nom. *Bennett* v. *Stump,* 393 U. S. 1001; *Johnson* v. *Bennett,* 414 F. 2d 50, 51, 56 (8th Cir.). He maintains, however, that phrases in the charge,[2] particularly when used in conjunction with a caution that alibi evidence should be scrutinized carefully,[3] suggest to the jury "an option to ignore the reasonable doubt test" in considering alibi evidence, contrary to the holding in *Smith* v. *Smith,* 454 F. 2d 572, 578 (5th Cir.).

The judge's instructions, unlike those in the *Smith* case, cannot be read to shift any onus of proof to the accused.[4] See *Sullivan* v. *Scafati,* 428 F. 2d 1023, 1025 (1st Cir.). There is no reasonable likelihood that the charge taken as a whole could have led the jury to ignore

---

[2] The defendant particularly objects to the underscored passages. "*To sustain the defense of alibi,* it is obvious that all the evidence tending to show the accused was in another place at the time the crime was committed is in direct conflict with the evidence that he was at the place at the time when the fatal act was done and he did it. *So whatever tends to support one claim tends to rebut the other,* because not yet can one man be in two places at the same time. . . . The obligation remains upon the Commonwealth to establish every essential element of this crime beyond a reasonable doubt . . . . That burden never shifts. *So obviously if you believe the alibi, the Commonwealth doesn't establish that.*"

[3] The judge charged: "And our Court has said this about alibi evidence: It should be scrutinized carefully. It is easily fabricated, it is difficult to disprove, and it is usually attested to by friends or relatives of the accused. And at the same time jurors should bear in mind that an albi may be the only refuge of the innocent . . . ."

[4] The judge in that case charged "the onus is on the accused to verify his alleged alibi, not beyond reasonable doubt, but to the reasonable satisfaction of the jury." *Smith* v. *Smith,* 454 F. 2d 572, 573 (5th Cir.).

the reasonable doubt test.[5]  See *Commonwealth* v. *Redmond,* 357 Mass. 333, 342–343, and cases cited; *Commonwealth* v. *French,* 357 Mass. 356, 405.

5. We have carefully reviewed the evidence as required by G. L. c. 278, § 33E, as amended. We find no error. Our review of the murder case indicates that it was open to the jury to return the verdict which they did, and that justice does not require the entry of a verdict of a lesser degree of guilt than that returned by the jury or that there be a new trial.

*Judgments affirmed.*

---

[5] After the passage quoted in note 2, *supra,* the judge continued: "Now, if you disbelieve the alibi, that doesn't automatically prove that this defendant was guilty. . . . You still have to find from all the evidence that he is in fact guilty of the crime charged. . . . And then it remains the burden of the Commonwealth to establish guilt of this defendant beyond a reasonable doubt."