COMMONWEALTH *vs.* RICHARD REPOZA.

Middlesex. September 9, 1980. — December 15, 1980.

Present: HENNESSEY, C.J., QUIRICO, WILKINS, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Capital case, Instructions to jury, Presumptions and burden of proof. *Evidence,* Cross-examination, Judicial discretion, Relevancy and materiality, Photograph, Identification. *Homicide. Malice.*

At a criminal trial, the judge did not err in excluding further inquiry into the substance of a conversation between a witness and the prosecutor during a recess in the trial after the defendant had been permitted to establish that the prosecutor had refreshed the witness's memory as to certain events but that the witness had not been instructed as to how to testify. [125-126]

At the trial of a defendant charged with murder after he allegedly stabbed the victim during a brawl between two groups of young people, the judge did not abuse his discretion in admitting in evidence a lead-weighted leather glove which was found in the course of a police search of the vicinity of the brawl on the night of the crime and which allegedly had been carried by one of the defendant's friends. [126-128]

At the trial of a defendant charged with murder after he allegedly stabbed the victim during a brawl between two groups of young people, the judge did not abuse his discretion in admitting photographs of the location where the victim had fallen which depicted unmistakable bloodstains on the sidewalk, inasmuch as the precise location of the victim at the time of the stabbing was a critical element of both the defendant's and the Commonwealth's case. [128-129]

At a murder trial, the judge did not err in permitting a police officer to testify as to a witness's prior extrajudicial identification of the defendant to corroborate the witness's in-court identification. [129-130]

At a criminal trial, the judge's instructions with respect to the evidentiary effect of a negative answer to a leading question were not, taken in their entirety, erroneous. [131]

At a murder trial, the judge's erroneous instructions with respect to a presumption of malice arising from the intentional use of a deadly weapon did not require reversal of the defendant's conviction where the instructions were otherwise clear and correct as to the Commonwealth's burden of proof and left no doubt that the jury could

return a verdict of murder only of they were satisfied of the existence of malice beyond a reasonable doubt. [132-135]

INDICTMENT found and returned in the Superior Court Department on July 11, 1978.

The case was tried before *Tamburello, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Paul P. Caradonna* for the defendant.

*Kevin C. McLean,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J. In the early morning of June 10, 1978, during the violent aftermath of a high school graduation party, John P. Grogan died of a knife wound to his heart. The defendant, Richard Repoza, was apprehended at the scene, was indicted by a grand jury for murder in the first degree, and, on November 2, 1978, following a nine-day jury trial, was found guilty of Grogan's murder in the second degree. On this appeal pursuant to G. L. c. 278, §§ 33A-33G, the defendant assigns a number of errors allegedly committed by the trial judge during the course of the trial, and in addition seeks to invoke the power of extraordinary review given this court by the provisions of G. L. c. 278, § 33E.[1] Neither our review of the defendant's specific assignments of error nor our independent review of the record reveals any error requiring reversal of the defendant's conviction or the entry of a verdict of a lesser degree of guilt.

Although a number of questions regarding Grogan's death remain unresolved or disputed, the outline of the

___

[1] Prior to July 1, 1979, G. L. c. 278, § 33E, provided for a full review by this court of any case tried on an indictment for murder in the first degree, and resulting in a conviction for murder in the second degree. By St. 1979, c. 346, § 2, the statute was amended to provide for special review only of cases in which the indictment leads to a conviction for murder in the first degree. This case, however, falls within the category of cases in which the offense resulting in the conviction was committed prior to July 1, 1979, and which thus remained eligible for our review under the rule announced in *Commonwealth* v. *Davis,* 380 Mass. 1, 12-17 (1980).

events preceding the killing is relatively clear. On the eve-
ning of June 9, 1978, Carlos Vargas hosted a party at his
home at 8 Hammond Street, Somerville, to celebrate his
graduation from Somerville Technical Trade High School.
In addition to his school friends, Vargas invited to the party
his steady girl friend, a resident of East Cambridge, and
suggested that she invite others. Most of Vargas' guests ar-
rived at about 8 P.M. Somewhat later, a group of about
eight Cambridge youths, all of whom learned of the party
through Vargas' girl friend, arrived at the Vargas house.
About 8:30 P.M., the defendant and a friend, John Caval-
laro, both of whom were from Cambridge and friendly
with the other Cambridge guests, arrived. In all the party
was attended by about fifteen boys from Somerville, six
from Cambridge, and a total of sixteen to twenty girls in ap-
proximately equal numbers from each city.

The party continued without incident until about mid-
night. The defendant was "hanging around," dancing,
talking, and perhaps watching television, and he caused no
trouble. Carlos Vargas had not asked him or any of the
Cambridge group to leave.

About midnight, Robert Devereaux of Somerville and
Joseph Long of Cambridge became involved in a scuffle in
the Vargas dining room. Devereaux thought that Long was
bothering some of the girls at the party and tried to stop
him. Zenalia Vargas, Carlos' mother, separated the two,
and told the crowd that the party was over; she went to the
cellar and removed an electrical fuse, thus stopping the
music and ending the party. The Vargas house emptied al-
most immediately into Hammond Street. Carlos Vargas
told the group to move away from his house and everyone
moved northerly along Hammond Street and turned easter-
ly onto Concord Avenue. Near the intersection of Concord
Avenue and Hammond Street, Long and Devereaux re-
sumed their fight, now surrounded by a crowd.

As is perhaps to be expected, the testimony describing the
events which followed is somewhat conflicting. The Com-
monwealth produced four witnesses who testified that the

defendant was at the scene of this fight with the knife later identified as the murder weapon. The first of these witnesses was Carlos Vargas. As he watched the fight, Repoza approached him with a knife in his hand, and, standing at about arm's length, said, "No, this is your party," or, "This is your party." As Vargas backed away, he was seized from behind by Francis Kelley, the first police officer at the scene, and the two began to grapple.

By the time Vargas had been subdued, Grogan had been stabbed. According to Officer Kelley, there was general fighting when he arrived on Concord Avenue. At some point after he arrived, the fight between Long and Devereaux broke up. Long retreated to the stairs of a three-story house diagonally across Concord Avenue from Hammond Street. Also on or near the stairs were the defendant, Robert Devereaux, Richard Trevisone, James Poplawski, and two girls from Cambridge. Both Devereaux and Long testified that while they were on the stairs, Devereaux kicked Long in the face; Long was knocked down from the stairs, and disappeared into the crowd, from which he emerged semi-conscious some moments later.

Three witnesses testified to seeing Repoza at the stairs holding a knife. Trevisone testified that while on the stairs, Repoza was holding a knife exposed in his hand. After telling Repoza three times to drop it, Trevisone grabbed him by the left hand and the neck and dragged him into the street. Repoza switched the knife from one hand to the other and offered to fight Trevisone. At this point, Poplawski attempted to intervene, but was struck by Long with a picket torn from a nearby fence. The victim, John Grogan, was also seen fighting in the immediate area. When Poplawski was struck, Repoza and Long, pursued by Poplawski and Trevisone, ran westerly down Concord Avenue toward Beacon Street. Ahead of them, running in the same direction, Grogan was pursuing two other unidentified persons. Trevisone saw Grogan stop, turn around, and punch the person he had chased. With Trevisone some twelve feet behind him, the defendant ran toward Grogan and, drawing

abreast of him, struck him once in the left side of the chest with the knife. Repoza then continued his flight. Trevisone stopped momentarily, then resumed his pursuit of Repoza. Near the corner of Beacon Street and Concord Avenue, Trevisone overtook Repoza, and delivered three kicks, one to Repoza's stomach and two to his groin. Trevisone was then jumped from behind and lost the defendant. Seeing a police car turn onto Concord Avenue in front of him, Trevisone ran back to the Vargas house, but after a minute he returned to where Grogan was lying. Trevisone approached one of the police officers present and said, "You have to get him," or, "You can get him." Then, accompanied by an officer, Trevisone walked toward Hammond Street. The defendant was at this time handcuffed and sitting in the back seat of a police cruiser; on seeing him Trevisone immediately identified him as Grogan's assailant.

Trevisone was the only witness who testified that he saw the defendant stab Grogan. Significant details of his testimony, however, were corroborated by other witnesses. Poplawski saw Repoza with a knife on the porch of the house on Concord Avenue, and participated in the ensuing chase. He saw Grogan cross onto the sidewalk of Concord Avenue. Poplawski caught Long, knocked him down and kicked him. Looking up, he saw Trevisone, Repoza, and Grogan close together on Concord Avenue; he then saw Repoza "punch" Grogan in the upper chest, and watched Grogan stumble toward him bleeding. Poplawski chased Repoza around the corner of Beacon Street, and saw him throw something to his right near the corner. Poplawski caught Repoza on Beacon Street, where both were "grabbed" by Officer Robert F. Hodnett. Thinking that Repoza might escape, Poplawski said to Hodnett, "Grab him. He is the one who stabbed him." Officer Hodnett escorted both youths back to Concord Avenue and placed them in patrol cars; Poplawski subsequently made a second identification of Repoza.

Officer Michael F. Gaughan and Detective Philip J. Oteri were also at the scene of the fight. Gaughan escorted

Trevisone to the cruiser in which Repoza had been placed; both he and Oteri testified that Trevisone positively identified Repoza at that time. Oteri found the knife later identified as the murder weapon in a place consistent with Poplawski's description of where it had been thrown by Repoza. Finally, the Commonwealth presented a resident of Concord Avenue, who, awakened by the noise of the fight, looked out her window in time to see a group of about six persons leave the main group and run toward her house. As they passed her house, Grogan seized his chest, staggered, and fell, bleeding.[2]

Repoza did not testify in his own behalf. Two girls from the Cambridge group testified that they were with Repoza immediately after the Long-Devereaux fight, and that they saw no knife. There was also testimony by these two Cambridge girls that, following his fight with Long, Devereaux threatened them with a knife. A number of other defense witnesses testified to details of the brawl, which, if believed, might have cast doubt on the account given by the Commonwealth's witnesses. None, however, significantly undermined the central eye-witness testimony given by Trevisone and Poplawski.

1. *Evidentiary rulings.* Initially, the defendant assigns as error four evidentiary rulings made by the trial judge. These include certain limitations on the defendant's cross-examination of Trevisone, the admission in evidence of a weighted glove found at the scene of the crime, the admission of numerous photographs of the scene, and the admis-

----

[2] The Commonwealth also placed John Cavallaro on the stand. Cavallaro was from Cambridge and had arrived at the party with the defendant. He was the only member of the Cambridge group to testify for the Commonwealth. On direct examination, Cavallaro's testimony largely corroborated the account of events given by Trevisone and Poplawski. He was, however, a sufficiently difficult witness that the judge allowed the Commonwealth to use leading questions during direct examination. Under cross-examination, Cavallaro stated that he saw the victim emerge from a "pile" of people on the ground, then stagger and fall. Because Cavallaro's testimony was not essential to the Commonwealth's case, and because there was ample reason for the jury to disregard it, we do not dwell on it here.

sion of certain testimony from Detective Oteri as to Trevisone's on-the-scene identification of the defendant. We discuss these points seriatim; in none do we find any error.

a. *Scope of cross-examination.* Defense counsel by cross-examination sought to develop certain inconsistencies between Trevisone's description at the trial of the stabbing and a physical demonstration of the incident given by Trevisone at the earlier probable cause hearing. The Commonwealth objected on the ground that the transcript of the probable cause hearing did not adequately reflect the details of the earlier demonstration. After repeated attempts at clarification, including two bench conferences, the court took a twenty-four minute recess. Immediately following the recess, defense counsel elicited from Trevisone the information that, during the recess, he had met with the prosecutor in the prosecutor's office, that they had discussed the case, and that the prosecutor had refreshed his memory. Trevisone further testified that he had not been told what to say. At that point, the judge excluded further inquiry into the substance of the conversation.

The accused in a criminal case is, of course, guaranteed the right to reasonable cross-examination of the State's witnesses. *Davis* v. *Alaska*, 415 U.S. 308, 316 (1974). *Commonwealth* v. *Dougan*, 377 Mass. 303, 310 (1979). Equally well settled, however, is the principle that "the scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry." *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952). *Commonwealth* v. *Underwood*, 358 Mass. 506, 513 (1970). The burden of showing an abuse of discretion and resulting prejudice is on the defendant, and our determination must be made by considering the cross-examination in its entirety. *Commonwealth* v. *Hall*, 369 Mass. 715, 731 (1976). On this record, there is no sign of prejudice. The defendant was allowed to establish that Trevisone had had his memory

refreshed and that he had not been instructed as to how to testify.  Significantly, defense counsel was ultimately successful in his attempt to show that Trevisone was unsure as to how the defendant was holding the knife when the fatal blow was struck.  At most, this was an instance in which "the judge's ruling 'did not totally exclude cross-examination . . . [about the witness's conversation with the prosecutor], but only limited additional questions on that subject once it had already been raised and explored to some extent before the jury.'"  *Commonwealth* v. *Smallwood,* 379 Mass. 878, 889 (1980), quoting from *Commonwealth* v. *Watson,* 377 Mass. 814, 837 (1979).  It is clear that such a ruling is within the province of the trial judge absent a particularized showing of prejudice wholly lacking here.  *Commonwealth* v. *Hall, supra.*  See *Commonwealth* v. *Valliere,* 366 Mass. 479, 492 (1974) (no error in excluding question as to why police detective had interfered in discussion between defense counsel and prosecution witness in corridor outside court room during a break in trial).

b. *Admissibility of "sap glove."*  The defendant next challenges the admission in evidence of a lead-weighted leather glove, or "sap glove," found in the course of a police search of Concord Avenue on the night of the crime.  This weapon played a relatively minor part in the Commonwealth's case.  It was first mentioned on the second day of trial during the testimony of Carlos Vargas.  Defense counsel had, during an extended cross-examination of Vargas, inquired broadly into the circumstances surrounding the Long-Devereaux fight.  On redirect examination, the judge allowed Vargas to testify over the defendant's objection that he had seen someone other than the defendant at the scene of the fight with something "they could use for hitting people."  Defense counsel then elicited from Vargas testimony that he had seen Kenneth Belski, of Cambridge, with a weapon at the scene of the fight.  Finally, on further redirect examination, Vargas was allowed to testify that he had seen Belski with a sap glove.  The glove itself was allowed in evidence when Officer Hodnett identified it as

having been found during his search of Concord Avenue shortly after the stabbing.  On the sixth day of trial, Detective Oteri testified without objection as to the use of sap gloves.  On the seventh day of trial, the defendant called Belski to the witness stand, and on cross-examination the prosecutor elicited his denial that he had been armed with the sap glove on the night of the crime.

The defendant now claims that admission of the sap glove was prejudicial in that it may have given rise to an inference that persons associated with him were armed and predisposed to cause trouble when they arrived at Vargas' party. That it appears in retrospect that an inference harmful to the defendant may have been drawn from this evidence is not, without more, a ground for appeal.  In a recent and similar case involving a homicide which occurred in the course of a violent clash between two opposing groups, this court had occasion to emphasize the breadth of a trial judge's discretion in admitting penumbral evidence of events preceding the homicide.  *Commonwealth* v. *Alicea*, 376 Mass. 506, 522 (1978).  Articles discovered at or near the scene of a crime have consistently been held admissible by this court where they tend to shed light on the setting in which the crime occurred.  *Commonwealth* v. *Murphy*, 356 Mass. 604, 610 (1970).  *Commonwealth* v. *Wallace*, 326 Mass. 393, 395-396 (1950).  *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 470 (1942).  *Commonwealth* v. *Russ*, 232 Mass. 58, 79 (1919).  *Commonwealth* v. *Retkovitz*, 222 Mass. 245, 249 (1915).

In this case, both the Commonwealth and the defendant presented detailed evidence of the circumstances preceding John Grogan's death.  Defense counsel claimed, and was allowed, broad latitude in presenting evidence "incidental to the total concept of what happened that night."  This court will not disturb a trial judge's discretionary ruling where, as here, the defendant seems to have been "as much interested in developing [the disputed material] as the prosecution." *Commonwealth* v. *Alicea, supra.*  Cf. *Commonwealth* v.

*Williams,* 379 Mass. 600, 605-606 (1980); *Commonwealth*
v. *Gouveia,* 371 Mass. 566, 570 (1976).[3]

c. *Photographic evidence.* The Commonwealth intro-
duced as exhibits fifteen photographs, twelve of them in
color, all taken on the day of Grogan's death. A number of
these depict unmistakable bloodstains on the sidewalk and
the travelled surface of Concord Avenue at the location
where the victim fell after being stabbed. The defendant
objects generally to their admission, claiming that they were
highly inflammatory and possessed only cumulative eviden-
tiary value, as the jury had taken an extensive view of Con-
cord Avenue early in the trial.

There was no error in admitting these photographs. It is
axiomatic that the admissibility of photographic evidence is
committed to the sound discretion of the trial judge, limited
only in those rare instances in which the probative value of
the evidence is overwhelmed by its inflammatory potential.
*Commonwealth* v. *Cobb,* 379 Mass. 456, 468-469 (1980).
*Commonwealth* v. *Amazeen,* 375 Mass. 73, 84 (1978). *Com-
monwealth* v. *Bys,* 370 Mass. 350, 360-361 (1976). The pre-
cise location of the victim at the time of the stabbing was a
critical element of the defendant's, as well as the Common-
wealth's, case. The judge carefully instructed the jury prior

---

[3] The defendant further argues that the prosecutor in closing argument
improperly intimated that the sap glove belonged to the defendant. In
closing argument, the prosecutor referred to the glove and said "Where
did this come from? Young Belski never saw [it] before. But who said he
threw it away? Who saw him throw it away? Who does this glove fit? I
suggest to you, try it on when you get out into the jury room. They were
ready, and [the defendant] was ready to use that knife that night going up
the street." Although this passage is not without its ambiguities, read in
the context of the conflicting testimony as to possession of the glove, it ap-
pears to be directed to the fact that other members of the Cambridge
group were armed at the party. Carlos Vargas, of course, testified to this
fact at trial. Particularly where the defendant failed to object to the
challenged statement during the closing argument, and requested no
limiting instruction as to inferences to be drawn from the discovery of the
sap glove at the scene of the killing, the quoted passage presents no basis
for reversal. *Commonwealth* v. *Earltop,* 372 Mass. 199, 203-204 (1977).

to admitting the first photograph that it was admitted for the sole purpose of showing the location of the victim's body and not to show the presence of bloodstains. Similar instructions were repeated on at least three occasions as other photographs were admitted. We recognize that, in the final analysis, any amount of limiting instruction may be insufficient to overcome the commonsense observation of a jury that a stab wound to the heart will cause considerable bleeding. But where the allegedly inflammatory element of a photograph offered as evidence is a natural and inevitable incident of the crime, and the photograph is otherwise probative, there is little basis to disturb the ruling of a trial judge as to its admissibility. Compare *Commonwealth v. Cobb, supra,* with *Commonwealth v. Allen,* 377 Mass. 674, 678-680 (1979); and *Commonwealth v. Richmond,* 371 Mass. 563 (1976).[4]

d. *Admissibility of testimony as to extrajudicial identification.* Philip Oteri, a detective for the Somerville police department, was allowed at trial to testify that shortly after Grogan was stabbed, Trevisone was escorted to the police cruiser in which Repoza was sitting, at which point Trevisone stated, "That's him. That's the one who stabbed John." The defendant, in his final evidentiary point, argues that this testimony was inadmissible hearsay.

The hearsay rule renders extrajudicial statements inadmissible only if they are offered to prove the truth of the matters asserted in the statement. W.B. Leach & P.J. Liacos, Massachusetts Evidence 183 (4th ed. 1967). Before Oteri testified, Trevisone had, from the witness stand, identified the defendant as the person who stabbed Grogan, and had further testified that when he observed Repoza in a

---

[4] In closing argument, defense counsel drew the jury's attention to the nature of the victim's wound — "through the ventricle, the pumping chamber of the heart, spurts it right out" — in an attempt to demonstrate that the wound was inconsistent with the Commonwealth's account of the circumstances surrounding the stabbing. Without questioning the effectiveness of this argument, we note that it underscores the futility of trying to keep from the jury in a case such as this the gruesome nature of the victim's wounds.

police cruiser on the night of the crime, he had stated to Officers Gaughan and Oteri, "That's him." Oteri's testimony was thus admissible under the rule allowing testimony as to prior extrajudicial identifications to be introduced to corroborate an in-court identification. *Commonwealth* v. *Sheeran,* 370 Mass. 82, 87 (1976). *Commonwealth* v. *Swenson,* 368 Mass. 268, 273 (1975). *Commonwealth* v. *Leaster,* 362 Mass. 407, 411-412 (1972). See *Commonwealth* v. *Redmond,* 357 Mass. 333, 341 (1970). In these circumstances, the testimony is admitted "not for the truth of the matter asserted, but to corroborate the fact of prior identification." *Commonwealth* v. *Sheeran, supra.*[5] Although a limiting instruction as to the effect of such testimony is preferable, *Commonwealth* v. *Leaster, supra* at 412, such an instruction is not mandatory where, as here, the jury would naturally view the testimony as merely corroborative.[6] *Commonwealth* v. *Denault,* 362 Mass. 564, 567 (1972).

2. *Instructions to the jury.* Two points arising from the trial remain for discussion. Both have to do with the judge's instructions to the jury. The first is raised by the defendant in his brief; the second we discuss in accordance with our obligation under G. L. c. 278, § 33E, to review the record in this case to determine whether justice may require a new trial or the entry of a verdict of a lesser degree of guilt.

---

[5] We note that the use in evidence of an extrajudicial identification is not limited to corroboration. Such an identification may also be offered (a) for the purpose of impeachment and (b) as substantive evidence of the identification, where the witness is available in court to testify, but is either unable or unwilling to make an in-court identification. See *Commonwealth* v. *Vitello,* 376 Mass. 426, 459-461 (1978), and authorities cited.

[6] The corroborative nature of Detective Oteri's testimony must have been particularly obvious to the jury in this case. Two prosecution witnesses, Trevisone and Poplawski, identified the defendant as Grogan's assailant. On the fourth day of trial, two days prior to Oteri's appearance, Officer Gaughan testified without objection to Trevisone's on-the-scene identification of the defendant. His testimony was substantially identical to that challenged here. In addition, a third police officer, Hodnett, testified to an extrajudicial identification of the defendant made by Poplawski, again without defense objection and prior to Oteri's appearance.

a. *Instructions on leading questions.* The defendant asserts that the judge erred in his instructions to the jury with regard to the evidentiary effect of a negative answer to a leading question. The instruction to which the defendant particularly objects occurred on the second day of trial. During his cross-examination of Trevisone, defense counsel asked, "Do you recall Richard Repoza jumping into the [Long-Devereaux] fight, trying to break it up?" to which Trevisone answered, "No." The judge then instructed the jury as follows: "Now, I am going to say to the jury, when the answer is 'no' to a question, you are not to take the body of the question as evidence, or to wonder or speculate if it was evidence. If the evidence [*sic*] is 'No', you are to disregard entirely the contents of the question, unless and until it is proved by somebody else at a later time. If somebody asked me, 'Judge, were you in New York last night?' and I said, 'No,' you are not to wonder if I was in New York. It just is not any evidence at all."

Defense counsel than thanked the judge and continued his cross-examination. On two other occasions during the trial, the judge again instructed the jury that the contents of a leading question are not evidence and must be disregarded unless and until they are properly proved. No objection was made nor exception saved by defense counsel when any of these rulings was made. See Mass. R. Crim. P. 22, 378 Mass. 892 (1979).

On this appeal, it is argued that the final two sentences of the quoted instruction were misleading in that the example cited by the judge would at least produce evidence that the person answering was not in New York on the night in question. We disagree. Read in their totality, the judge's instructions on this point were such that no reasonable juror could have been misled by them. Cf. *Commonwealth* v. *Medina*, 380 Mass. 565, 577 (1980). Since this issue was not raised at trial, either by objection or by a request for clarifying instructions, our reviewing function is limited indeed. See *Commonwealth* v. *Walden*, 380 Mass. 724, 731 (1980). In this instance, however, no review, whether limited or plenary, would lead to a different conclusion.

b. *Instruction on malice.* While we find no error in any of the points argued by the defendant, the provisions of G. L. c. 278, § 33E, bring the "whole case" here for consideration of both law and evidence. We therefore discuss one further point.

In his charge to the jury on the element of malice required to support a murder conviction, the judge spoke twice of a "presumption" of malice arising from the intentional use of a deadly weapon in a homicide.[7] This was incorrect.

While the element of malice aforethought necessary to elevate homicide to murder may be inferred from the intentional use of a deadly weapon, *Commonwealth* v. *Campbell*, 375 Mass. 308, 312-313 (1978), it is constitutionally required that the Commonwealth prove every essential element of a crime beyond a reasonable doubt. *Commonwealth* v. *Callahan*, 380 Mass. 821, 825 (1980), and cases cited. Well before the trial in this case, this court had made clear the impropriety

---

[7] In his instructions to the jury at the close of trial, the judge explained the concept of malice aforethought in the following terms: "So what is malice as used in the words: malice aforethought? Well, it is of two kinds. It is active malice, which we all understand by the simple use of the words in this meaning: an active malice is ill will towards someone. It is the active hatred of someone. It is a grudge or an ill feeling toward someone, harboring an attempt to hurt someone, or act of bad blood or feeling, generating motives of revenge or punishment. That is active malice. But you are not looking for active malice alone. You are looking for an unlawful, unjustified act with no extenuating circumstances, and the wrongfulness of the act itself is sufficient to sustain a finding of malice so far as the law is concerned.

"That is perhaps malice implied in law as distinct from malice that you find from the conduct of people. *And when a killing is caused by the intentional use of a deadly weapon, there arises the presumption of malice aforethought.* Because, as that term has long been understood and applied in this Commonwealth, the use of a deadly weapon, itself capable of causing harm and death, if an unjustified act with no extenuation or excuse, is sufficient itself to supply the element of malice you are looking for in determining whether a crime is murder or less than murder.

"However, *the circumstances which attend to killing may be shown to rebut the presumption* by showing circumstances which, although they do not excuse the killing, might mitigate it from the crime of murder to manslaughter. And this I will discuss for you when I define manslaughter." (Emphasis supplied.)

inherent in the use of language which might suggest to a jury that any element of a crime may be presumed, or that the burden of rebutting the Commonwealth's case ever shifts to or rests on the defendant. *Commonwealth* v. *Collins*, 374 Mass. 596, 600 n.2 (1978). *Commonwealth* v. *Rodriguez*, 370 Mass. 684 (1976). Moreover, we had announced our intention to scrutinize carefully cases decided after *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975), for the constitutional adequacy of the instructions given to the jury regarding the Commonwealth's burden of proof. *Commonwealth* v. *Collins, supra* at 599.

Several recent cases further articulate the nature of the scrutiny alluded to in *Collins*. In *Commonwealth* v. *Callahan, supra,* we reversed a conviction of murder in the first degree based on our conclusion that, in that case, the judge's instructions as to a "presumption" of malice arising from proof of the defendant's intentional use of a deadly weapon had created the substantial risk of a miscarriage of justice. *Id.* at 822. The jury charge in that case was defective in two respects. First, after instructing the jury that the legal effect of a presumption is to require that a certain conclusion be drawn from facts proved, the judge used language of presumption six times in explaining to the jury the effect of the Commonwealth's proof of the use of a deadly weapon. We held that the charge to the jury in that case, taken as a whole, clearly stated that unless the defendant had introduced some evidence negating malice, the jury were required to find malice from proof that the defendant intentionally used a deadly weapon to cause the victim's death. *Id.* at 824-825. The language of that charge, we held, clearly reflected an unconstitutional shifting of the burden of proof to the defendant to disprove malice. *Id.* at 824-825.

The second and equally grave defect in the *Callahan* charge involved the judge's reference to the "'plain and obvious principle that a person must be presumed to intend'" the natural, probable, and usual consequences of his voluntary acts. *Id.* at 823. Notwithstanding the small difference between the use of "must" and "may," we held that the use

of "must" in this context is reversible error when it could reasonably be interpreted, in light of the entire charge, to relieve the Commonwealth of any part of its burden of proof. *Id.* at 825.

The decision in *Callahan* exemplifies our rejection of an approach either narrow or mechanistic in our consideration of the issue raised in the present case. Cf. *Commonwealth v. Collins, supra.* In each case, the question "'whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction' . . . and . . . error is avoided if the charge, read as a whole, makes clear the Commonwealth's burden." *Commonwealth* v. *Medina, supra* at 578, quoting from *Sandstrom* v. *Montana,* 442 U.S. 510, 514 (1979). Here, as in *Medina,* the judge's erroneous equating of malice implied or inferred to malice presumed was ultimately vitiated by his repeated and careful instructions reinforcing the principle that the burden of proof on every essential element of the crime invariably remains with the Commonwealth. The judge began his instructions by explaining the presumption of innocence, stating clearly that the defendant "need not present evidence of his innocence, but may rest inactive and secure until the Commonwealth goes forward with evidence and proves him guilty." The charge went on at some length to state that every essential element of the crime must be proved by the Commonwealth beyond a reasonable doubt. The judge explicitly stated that "[a]ll the presumptions of law independent of evidence are in favor of innocence." The presentation of the nature and effect of permissible inferences was thoughtful and detailed. Finally, we think that the instructions on the nature of malice aforethought, which came after the judge's erroneous use of the word "presumption," were sufficient to dispel any misconception that might have been created by the error. These instructions left no doubt that the jury could return a verdict of murder only if they were satisfied of the existence of malice beyond a reasonable doubt.

In *Commonwealth* v. *Medina, supra* at 577-578, we found no error requiring reversal in a charge which made a single reference to a "presumption" of malice, but which was otherwise clear and correct as to the Commonwealth's burden of proof. Again, in *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 844-846 (1980), we upheld instructions substantially identical to those given here. Here, as in *Fitzgerald*, we are convinced that, read as a whole, the judge's instructions indicated that the jury "were required to find malice in order to convict of murder; [they] did not imply that the jury had to find an absence of malice in order to acquit of murder." *Id.* at 845.[8]

3. *Further § 33E considerations.* We reach finally the question whether the verdict in this case was supported by

---

[8] Although our decision in this case does not rest upon the failure of defense counsel to except to the incorrect instruction, it is well to note that trial counsel share with the judiciary the responsibility for ensuring that juries are properly instructed as to the Commonwealth's burden of proving a crime. *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 842 n.2 (1980). *Commonwealth* v. *Medina*, 380 Mass. 565, 577 n.5 (1980). A bench conference immediately following the instructions in the instant case reveals that both the defense counsel and the judge were under a misapprehension as to the effect of proof of the intentional use of a deadly weapon in the commission of a homicide. The prosecutor correctly and appropriately brought to the judge's attention the critical distinction between inferences and presumption in the following colloquy:

THE PROSECUTOR: "The only thing I was interested in was that you tell the jury that malice may be inferred when the killing is the result of an intentional use of deadly force."

THE JUDGE: "I covered that, too. When the killing is caused by the intentional use of a deadly weapon there arises a presumption of malice aforethought."

DEFENDANT'S COUNSEL: "Right."

The prosecutor twice again sought to alert the judge to the error before acquiescing in the instruction as given. We note also that included in the defendant's requested instructions on the elements of murder in the second degree was the following: "Every sane person is presumed to intend the natural and probable consequences of his acts. However, a specific intent is required as an element of the crime charged, so no inference of such intent may be drawn from the mere proof of the act." The requested instruction would be needlessly confusing to a jury. Our recent decisions in this area offer sufficient guidance to allow the formulation of clear and precise instructions on the inference which may permissibly be drawn from the intentional use of a deadly weapon in cases of homicide.

the weight of the evidence and consonant with justice. As to the first point, the Commonwealth clearly produced evidence sufficient to support a finding of murder in the second degree. Four witnesses testified that Repoza was at the scene of the killing armed with a knife. Zenalia Vargas, Carlos Vargas' mother, testified that the knife found near the scene of the crime, and identified as the one in the defendant's possession, did not come from her house. The clear inference from her testimony is that Repoza arrived at the party armed. Carlos Vargas testified that the defendant approached him with the knife, then said, "No, this is your party"; from this exchange, the jury could have inferred that the defendant was willing to use the knife offensively, and not merely defensively, once the trouble started. Both Trevisone and Poplawski gave eyewitness accounts of the stabbing. Poplawski's testimony on cross-examination was particularly damaging. He stated that after the incident on the stairs, Repoza fled down the travelled surface of Concord Avenue while Grogan ran on the sidewalk. From this testimony, the jury could have concluded that John Grogan did not stand in the defendant's natural route of escape, but that Repoza rather deviated from the shortest course to safety to strike the fatal blow.

Having considered this case as to the law and the evidence as we are required to do under G. L. c. 278, § 33E, we decline to grant the defendant a new trial or to direct the entry of a verdict of a lesser degree of guilt than that found by the jury.

*Judgment affirmed.*