COMMONWEALTH vs. RICHARD REPOZA.

No. 89-P-39.

Middlesex. October 5, 1989. - March 7, 1990.

Present: BROWN, KAPLAN, & PERRETTA, JJ.

*Homicide. Self-Defense. Practice, Criminal*, Instructions to jury, Preservation of evidence, Sentence.

The judge at the 1988 retrial of a 1978 murder indictment correctly denied the defendant's motion to dismiss the indictment or to exclude evidence based on the Commonwealth's loss or destruction of certain items of evidence, where the Commonwealth's culpability was greatly mitigated by the procedural history of the case, where some of the evidence was not material, and where, even if the missing evidence was material, no prejudice to the defendant from its loss was shown. [325-327]

No error appeared in the judge's instructions to the jury at the trial of an indictment for second degree murder. [328-329]

Where the judge at the retrial of a murder indictment impermissibly penalized, rather than credited, the defendant for the time served in prison for his previous conviction, which had been reversed on appeal, the case was remanded for resentencing. [329-331]

INDICTMENT found and returned in the Superior Court Department on July 11, 1978.

After an order denying the defendant's motion for postconviction relief was reviewed by the Supreme Judicial Court, 400 Mass. 516 (1987), the case was retried before *Hiller B. Zobel*, J.

*Bernard Grossberg* for the defendant.

*Kurt N. Schwartz*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. About four years after the defendant's conviction for murder in the second degree was affirmed, see *Commonwealth* v. *Repoza*, 382 Mass. 119 (1980) (*Repoza I*), he sought, pro se, postconviction relief under Mass.R.Crim.P. 30, 378 Mass. 900 (1979). The denial of

that motion was affirmed (22 Mass. App. Ct. 1110 [1986]), and further appellate review was sought and granted, 398 Mass. 1103 (1986). Upon further review, his conviction was reversed, see *Commonwealth* v. *Repoza*, 400 Mass. 516 (1987) (*Repoza II*), because of burden-shifting language in the jury instructions concerning the definition of malice aforethought. See *Sandstrom* v. *Montana*, 442 U.S. 510 (1979); *Francis* v. *Franklin*, 471 U.S. 307 (1985). At retrial, the jury found the defendant guilty of involuntary manslaughter. The judge imposed a sentence of not less than nineteen years and nine months, three months of which was suspended for five years. On appeal, the defendant argues that his conviction rests on erroneous evidentiary rulings and jury instructions and that the sentence imposed upon him violates his Federal and State constitutional rights. Although we find no error in his conviction, we conclude that his sentence must be vacated. We affirm the conviction, vacate the sentence, and remand the case for resentencing.

1. *The Evidence.*

At his first trial the defendant did not testify. The "main contested issue was identification, not intent," *Repoza II*, 400 Mass. at 522, that is, was it the defendant who fatally stabbed the victim, John P. Grogan, "during the violent aftermath of a high school graduation party," *Repoza I*, 382 Mass. at 120, attended by both the defendant and the victim. At his retrial, the defendant testified that, although he stabbed the victim, he did so under circumstances which excuse him from criminal responsibility. Because much of the evidence presented by the Commonwealth at both trials is substantially similar, see *id.* at 120-124, we here recite only the defendant's version of the events.

One of the graduates hosted a party at his house on Hammond Street in Somerville. When an argument began, his mother announced that the party was over and everyone was to leave. The guests spilled out onto the street, and the defendant began to walk to the corner of Hammond Street and Concord Avenue. He did not have a knife in his possession.

As he reached the corner at Concord Avenue, the defendant saw a crowd of at least twenty people standing around his friend, Joey Long. Long was leaning, half-sitting, against a fence. People were pushing, hitting, and kicking him. When the defendant stepped forward, the crowd began throwing things at him. He felt something bounce off his back. When it dropped to the ground at his side, the defendant saw that it was a knife. He picked it up and put it in the pocket of his jacket. The defendant then helped Long to the stairs of a nearby house.

Screaming threats at the defendant and Long, the crowd gathered around the stairs. The defendant took the knife from his pocket, held it in front of him, and told everyone that he wanted to leave and take Long with him. People kept inching forward, and he and Long were pulled from the stairs and into the throng. The defendant ended up in the street with someone sitting on top of him. He was able to free himself when someone hollered, "Cops."

Throughout this melee, the defendant had the knife in his hand but did not use it. Once on his feet, frightened and anxious to get away, the defendant began to run up Concord Avenue toward Beacon Street. He saw someone in front of him and slowed his pace. As he did so, he was grabbed around the neck from behind and beaten on his back. The person in front was punching him in the stomach. Still holding the knife, the defendant flailed to free himself. He hit both his attackers several times, the one to his front with the hand in which he held the knife.[1]

Neither intending to stab anyone nor knowing if he had, the defendant escaped and ran on. He was running so fast that he stumbled and fell. As the defendant picked himself up, he saw someone standing in front of him. This person kicked the defendant in the groin, grabbed him by the neck, threw him to the ground, and then threw himself over the defendant. As the defendant struggled, he felt additional weight land on the person atop him. This struggle ended

---

[1]As we read the transcript of the defendant's testimony, it was during this struggle that the fatal stabbing occurred.

when a car stopped directly in front of them and everyone scattered.

There is one more attack. After the defendant got up, he continued toward Beacon Street, now walking. Someone came upon him, knocked him to the ground, and began to beat him. This beating was stopped by the police, who handcuffed and arrested the defendant.

This testimony was in contradiction of that given by the Commonwealth's witnesses which supported its theory of the case, murder. Putting aside their testimony that the defendant was the aggressor at the scene of the stairs back at the corner of Hammond Street and Concord Avenue,[2] we begin with the pursuit of the defendant. Witnesses related that as they chased the defendant up Concord Avenue, they could see the victim up ahead. He was on the sidewalk, fighting with someone.

As the defendant ran, he deviated from his course. Running between several cars parked along the curb, the defendant ran onto the sidewalk and slowed his pace. He grabbed the victim and plunged the knife into his chest. The defendant then withdrew the knife and continued running along Concord Avenue.

The knife was found by the police in the area where one of the defendant's pursuers saw him throw something, near the corner of Beacon Street. It was an eight-inch steak knife with a four and one-half inch serrated blade. The victim died of a stab wound to his heart. The wound, one and one-half inches wide and in excess of three inches deep, was consistent with having been made by the weapon found by the police.

2. *Lost and Destroyed Evidence.*

During the ten-year period between the defendant's 1978 conviction and 1988 retrial, various items of evidence were lost and destroyed. Claiming that the Commonwealth's failure to preserve the evidence deprived him of his right to a fair retrial, the defendant moved to dismiss the indictment or

---

[2]Throughout these events, the defendant was the only person seen with a knife. The defendant himself testified that he did not *see* anyone with a knife, but he did not know whether anyone possessed one.

to exclude or otherwise limit all testimony and evidence re-lating to the lost and destroyed items. The judge denied the motion in all respects.

"For each piece of missing evidence shown to be poten-tially exculpatory, the judge must weigh the culpability of the Commonwealth and its agents, the materiality of the evi-dence, and the potential prejudice to the defendant." *Com-monwealth* v. *Olszewski*, 401 Mass. 749, 757 (1988). See also *Commonwealth* v. *Charles*, 397 Mass. 1, 13-14 (1986); *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). We begin the required analysis by considering the Common-wealth's culpability in general, because the circumstances are identical "[f]or each piece of missing evidence." *Olszewski*, *supra*.

Even if we assign some degree of culpability to the Com-monwealth, it must be greatly mitigated by the procedural history of the case.[3] There is no complaint that these items and reports concerning them were unavailable to the defend-ant in 1978. Further, in addition to the time lapse involved, ten years, there was a four-month hiatus in 1985, when it appeared that the defendant had abandoned his postconvic-tion attack.[4] See *Commonwealth* v. *Gomes*, 403 Mass. 258, 277 (1988).

We now consider the materiality of each item and the po-tential prejudice to the defendant from its loss or destruction. In so doing, we note that it was made known to the judge at the outset of the hearing on the motion that the defendant was raising claims of self-defense and accident.

---

[3]Any culpability attributable to the Commonwealth must be by reason of the fact that, in 1978, it did have possession of the items now at issue. As noted in *Commonwealth* v. *Olszewski*, 401 Mass. at 757 n.7: " 'Culpa-bility' and 'bad faith' are not interchangeable terms. Negligence or inad-vertence are less culpable than bad faith, but they are nevertheless culpa-ble and must be accounted for in the balancing procedure."

[4]The defendant's motion for a new trial was denied on September 17, 1984. He filed a timely notice of appeal, and, as reflected on the docket entries, his brief was due to be filed on January 14, 1985. For reasons not apparent from the available docket entries, the defendant's appeal was dis-missed on May 23, 1985, and was not reinstated until September 26, 1985.

a. *The knife.* On June 14, 1985, an assistant clerk of the trial court obtained a court order authorizing delivery of the knife to the Commissioner of Public Safety for its destruction. See G. L. c. 269, § 10(*e*). Delivery was made on July 1, 1985, see note 2, *supra*, and the knife was destroyed. The defendant argues that the knife was material on the following issues: whether it came from the house where the party was held; whether it could fit into the pocket of his jacket; and whether the Commonwealth's expert witness, a chemist, was mistaken in finding that the blood on the knife was human blood. Further, the defendant complains that destruction of the knife precluded him from demonstrating to the jury how he inflicted the fatal wound.

Those issues identified by the defendant in respect to the materiality of the origin and size of the knife seem more relevant to the crime of murder in the second degree, of which the defendant was acquitted. In respect to the claims of self-defense and accident, we see neither materiality nor prejudice in light of the defendant's testimony.

As for cross-examination of the Commonwealth's expert, the chemist's report was available to the defendant. To the extent the knife would have aided the defendant in a demonstration to the jury, there was nothing to preclude him from seeking to use a similar weapon. See, e.g., *Commonwealth* v. *Ellis*, 373 Mass. 1, 7 (1977).

b. *The defendant's jacket.* There is no dispute that the Commonwealth took possession of the defendant's jacket, shirt, trousers, and shoes at the time of his arrest. In addition to the claims of materiality raised as to the knife, the defendant adds to the loss of the jacket a claim that he was prevented from showing that he was bloodied by the beatings he received. Such evidence would have been material to his claim of self-defense.

There was, however, little, if any, prejudice to the defendant as a result of the loss of his jacket. The defendant's clothing was tested to determine the presence of blood. The test results and reports were available to the defendant. The chemist testified that he found no blood on the jacket. There

were, however, human blood smears on the defendant's shirt and on the "front, the seat area, and both legs" of his trousers. "[N]othing of apparent evidential significance was found" on the defendant's shoes.[5]

c. *Interview tapes.* On the day of the stabbing the police interviewed two witnesses and tape recorded their statements. The interview tapes were then transcribed. At the time of the retrial the Commonwealth could not locate the tapes, but the defendant did have the transcriptions. The defendant argued at the hearing on the motion to dismiss that the transcriptions were not sufficient because, in order to show the emotional state of the witnesses at the time of their statements, the jury would have to hear the tapes. We think it enough to state only that we see no error in the judge's ruling on the motion in respect to the tapes on the basis then argued by the defendant.

On appeal, however, the claim concerning the tapes changes. During cross-examination of the two witnesses, there were several instances where the witnesses either could not recall having made certain statements appearing in the transcriptions or denied having made them. The defendant now argues that the loss of the tapes precluded him from impeaching the credibility of these witnesses with "major" discrepancies between their transcribed statements and their testimony. Passing over the procedural flaws in the argument (whether the defendant established the requisite evidentiary foundation upon which to impeach credibility with prior inconsistent statements and whether the issue has been preserved for review), we see no error for the reasons discussed in *Commonwealth* v. *Charles*, 397 Mass. at 14.

d. *The victim's identification card.* Originally believed lost, the victim's liquor identification card was found by his mother after the hearing and ruling on the motion to dismiss. The defendant was given great latitude on cross-examination

---

[5]Loss of the defendant's shoes is raised for the first time on appeal. It makes no difference in our result that we decline to consider the argument (see *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 [1987]), which is identical to that made relative to the jacket.

of the witness whose name appeared on the card with the victim's photograph. The judge, however, would not admit the card in evidence. The defendant's argument that this exclusion mandates reversal of his conviction does not merit discussion.

3. *The Jury Instructions.*

There is nothing in the judge's instructions to the jury which requires reversal of the defendant's conviction. On the evidence presented, the victim died of a single stab wound to his heart. Assault and battery is not a lesser included offense of murder in the second degree. "A battery that causes death is manslaughter. *Commonwealth* v. *Campbell*, 352 Mass. 387, 397 (1967). *Commonwealth* v. *Sostilio*, 325 Mass. 143, 145 (1949)." *Commonwealth* v. *Bianco*, 388 Mass. 358, 362 (1983).

It is not error to refuse to instruct in the language requested by the defendant. See *Commonwealth* v. *Sherry*, 386 Mass. 682, 696 (1982). The judge made clear to the jury that an accident is not a crime and that the Commonwealth had the burden to prove beyond a reasonable doubt that the stabbing was not accidental. See *Commonwealth* v. *Palmariello*, 392 Mass. 126, 145 (1984).

There was nothing in the evidence to require an instruction on proximate cause. Compare *Commonwealth* v. *Parker*, 25 Mass. App. Ct. 727 (1988). That the acts of the victim could be relevant on the question of the defendant's criminal responsibility was fully explained to the jury by the judge in his instructions on accident and self-defense.

"Self-defense is raised when there has been an overt act against the defendant constituting an assault or threat (*Commonwealth* v. *Doucette*, 391 Mass. 443, 453-454 [1984]; *Commonwealth* v. *Shaffer*, 367 Mass. 508, 514-515 [1975]), sufficient to place the defendant in actual and reasonable apprehension of grievous bodily harm or death (*Commonwealth* v. *Kendrick*, 352 Mass. 203, 211 [1966]). There must also be evidence that the defendant took all proper means to avoid physical combat before using deadly force. See *Commonwealth* v. *Epsom*, 399 Mass. 254, 258 (1987)." *Common-*

*wealth* v. *Glass*, 401 Mass. 799, 808 (1988). The judge repeated his instruction on self-defense several times: "[S]elf-defense consists of a necessity to a reasonable person in the defendant's position of avoiding what a reasonable person in the defendant's position would believe was grievous, serious bodily harm. Under those circumstances, a person is permitted to use that degree of force, including deadly force, that is reasonably necessary to avoid the grievous bodily harm." We do not think that the difference between the defendant's reasonable apprehension and the apprehension of a reasonable person "in the defendant's position" creates a substantial risk of a miscarriage of justice.[6] The remaining claims of error in the instructions do not warrant discussion.

4. *The Sentence.*

As earlier noted, the judge sentenced the defendant to a term of imprisonment for not less than nineteeen years and nine months, three months suspended for a period of five years.[7] Twenty years is the maximum period of incarceration

---

[6]Prior to closing arguments, the judge went over his proposed instructions in detail with the parties, including the instruction on self-defense. The defendant requested well over fifty specific instructions. In the course of the conference, he made no comment or particular objection to the language covering self-defense. The only purported objection upon which he now relies came at the conclusion of the conference: "I would object for the record . . . to the Court not giving instructions requested in the defendant's request that the Court has decided not to give, for the record . . . ." After the judge delivered his charge to the jury, the defendant voiced concern on the instructions pertaining to malice and wanton and reckless conduct. He was silent on the issue of self-defense. See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979). Objections are not ceremonial. "The purpose of the objection is to insure that an alleged error is brought clearly to the Judge's attention in order that the Judge may squarely consider and decide the question and rectify the error, if any." Smith, Criminal Practice and Procedure § 1775 (2d ed. 1983).

[7]The Commonwealth recommended a sentence of not less than nineteen years and six months, three months suspended for five years with probation. This recommendation was based upon the Commonwealth's view that the defendant, while incarcerated since 1978, had not been rehabilitated as indicated by the many institutional disciplinary reports and lawsuits filed by the defendant. There is nothing in the record to suggest that the judge accepted or shared the Commonwealth's view, probably because of the very reasons pointed out by another judge in admitting the defendant to bail pending this appeal: The disciplinary reports made no distinction "be-

that can be imposed for the crime of manslaughter, voluntary or involuntary. See G. L. c. 265, § 13. There is, therefore, no question that the sentence is authorized by statute.

Although "it is not a function of this court to review an otherwise lawful sentence which is within the limits of the applicable statutory provisions," *Commonwealth* v. *Franks*, 365 Mass. 74, 81 (1974), sentences based upon erroneous or impermissible considerations have been vacated. *Ibid.* See also *Commonwealth* v. *Coleman*, 390 Mass. 797, 804-805 (1984); *Commonwealth* v. *Murray*, 4 Mass. App. Ct. 493, 496 (1976).

The issue before us is whether the sentence is based upon impermissible reasons. Consideration of the question has been facilitated by the judge's candid and detailed explanation of the sentence. Further, his explanation directly refutes the defendant's claim of vindictiveness in the sense of *North Carolina* v. *Pearce*, 395 U.S. 711, 723-726 (1969), that is, imposition of a harsher sentence upon reconviction following a successful appeal as a punishment for that appeal.

At the time of sentencing, the defendant had been incarcerated for just over ten years. As explained by the judge in imposing sentence, the normal or average sentence imposed upon one convicted of the crime of involuntary manslaughter "would ordinarily require less incarcerated time than the defendant has already served." The judge went on to conclude, however, that the sole fact of the defendant's prolonged incarceration required further incarceration. He viewed "catastrophe" as "virtually certain" were the defendant to be released "abruptly, without an opportunity to readjust," without an "opportunity to reintegrate himself into society gradually."

---

tween those in which there was a finding of guilt and those in which there was not," an overwhelming number of the reports had been issued prior to 1983, and the most recent reports reflected that the defendant displayed "dependability," "ability to work without supervision," and a lack of "any tendency . . . to place himself in situations in which he would probably get into trouble." Because the judge did not rely upon the Commonwealth's reasoning in imposing sentence, it is unnecessary to consider the defendant's argument concerning prosecutorial vindictiveness.

As a very real matter, the defendant has been penalized for, rather than credited with, the days served for his criminal conduct. There are permissible ways to achieve the goal desired by the well-intentioned judge. However, further incarceration to ameliorate the effects of incarceration already in excess of the norm is not one of them.

5. *Conclusion.*

It follows from what we have said that the defendant's conviction is affirmed. The sentence imposed is vacated, and the case is remanded to the Superior Court for resentencing.

*So ordered.*