COMMONWEALTH *vs.* JOSE RODRIGUEZ.

No. 97-P-2051.

Norfolk. June 7, 1999. - November 3, 2000.

Present: JACOBS, LAURENCE, & BECK, JJ.

*Practice, Criminal,* Preservation of evidence, Instructions to jury. *Identification. Evidence,* Photograph, Relevancy and materiality, Exculpatory, Past recollection recorded, Consciousness of guilt. *Constitutional Law,* Self-incrimination. *Error, Harmless.*

A criminal defendant did not establish that a photographic array, lost between his first and second trials through no fault of the prosecution, would have produced evidence favorable to his defense of misidentification, or that the array was even material [411-413]; nor was the similar loss of a jacket seized by police from the defendant's apartment, which the defendant had examined by an expert before his first trial, shown to be so critical to the defense as to make the trial fundamentally unfair [414-415]: there was no error in the judge's denying the defendant's motion to dismiss and protecting the defendant's rights at the second trial by allowing reference to prior testimony, limiting the introduction of certain evidence, and instructing the jury that the defendant was to have the benefit of any doubt about the evidence.

Testimony at a five-day rape trial that the defendant briefly refused before providing a hair sample to investigators, which evidence was never mentioned again, never related to any incriminating evidence, nor mentioned in closing argument, was harmless, in the circumstances, beyond a reasonable doubt. [415-417]

At the retrial of a criminal case after a mistrial, the victim's testimony from the first trial identifying the kind of material in the jacket worn by her assailant was properly admitted as past recollection recorded. [417-418]

At the retrial of a criminal case after mistrial, the judge properly allowed the jury to consider the credibility of the defendant's statements to police and of the defendant's testimony at the first trial as evidence of consciousness of guilt. [418]

INDICTMENTS found and returned in the Superior Court Department on January 6, 1977.

Following review by the Supreme Judicial Court, 378 Mass. 296 (1979), and 419 Mass. 1006 (1995), the cases were tried

before *James F. McHugh, III*, J., and a motion for a new trial was heard by *Barbara A. Dortch-Okara*, J.

*Patricia A. O'Neill*, Committee for Public Counsel Services, for the defendant.

*Robert C. Cosgrove*, Assistant District Attorney, for the Commonwealth.

BECK, J. In an opinion known for setting out model jury instructions for identification, the Supreme Judicial Court reversed the defendant's 1977 conviction of rape, and assault and battery with a dangerous weapon, and ordered a new trial. *Commonwealth* v. *Rodriguez*, 378 Mass. 296 (1979). Released on bail following the opinion, the defendant did not appear on the date set for his new trial. By the time he was apprehended in California and returned to Massachusetts seven years later, the photographic array shown to the victim immediately after the rape, and the defendant's jacket, obtained in a search pursuant to a warrant the day after the rape, had disappeared. The defendant moved to dismiss the indictments on the ground that the missing evidence was clearly exculpatory and therefore crucial to his defense. The trial judge denied the defendant's motion and made rulings as to how the missing evidence would be dealt with. The defendant now appeals from his second convictions in 1987 and from the denial of his subsequent motions for a new trial and for postconviction dismissal.

The basic facts are not contested. On the evening of September 27, 1976, someone grabbed the victim, a twenty-one year old student at Boston University, as she walked home from the Brookline Hills MBTA station, jabbed a broken bottle into her neck, put his jacket over her face, and raped her in the backyard of a nearby house. The dispute is whether the defendant was the assailant. The defense was that the victim was mistaken when she identified the defendant.

On appeal, the defendant claims it was error to deny his motion to dismiss based on the lost evidence. He also claims that his trial counsel was ineffective in his handling of the motion to dismiss, and that there was error in the admission of evidence that he refused to provide a sample of his pubic hair, in the introduction of hearsay evidence as past recollection recorded, and in giving jury instructions on consciousness of guilt. We take each of these arguments in turn, adding such facts as may be necessary to our analysis.

1. *Lost evidence.* "[W]hen potentially exculpatory evidence is

lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). "[The] test does not require the Commonwealth to prove good faith or earnest efforts to preserve the evidence. The Commonwealth's conduct is merely a factor to be weighed in determining its culpability. That culpability, if any, is then weighed along with the other two factors, materiality and prejudice, in determining whether, and to what extent, any remedy will be employed." *Id.* at 432-433. "An analysis of the prejudice to the defendant necessarily involves an inquiry into the exculpatory nature of the evidence. . . . While the defendant need not prove that the evidence would have been exculpatory, he must establish 'a "reasonable possibility, based on concrete evidence rather than a fertile imagination," that access to the [material] would have produced evidence favorable to his cause.' " *Id.* at 433, quoting from *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). "Evidence is material if, in considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise exist." *Commonwealth* v. *Otsuki*, 411 Mass. 218, 231 (1991), citing *Commonwealth* v. *Wilson*, 381 Mass. 90, 107 (1980), *S.C.*, 399 Mass. 455 (1987). If the judge applies that correct test, "we 'will not disturb [his] findings . . . in the absence of clear error.' " *Commonwealth* v. *Harwood*, 432 Mass. 290, 295 (2000), quoting from *Commonwealth* v. *Waters*, 420 Mass. 276, 279 (1995).

Here the trial judge found that the "exhibits were lost while in the possession of the courts, most likely while in the possession of the Clerk of th[e Superior] Court" and that they "were not lost while in the hands of the prosecutor or through the prosecutor's fault." See *Commonwealth* v. *Repoza*, 28 Mass. App. Ct. 321, 324-325 & n.3 (1990). The trial judge noted that the lost evidence had been available at the first trial, that it had been analyzed, and that the defendant had the opportunity to engage his own expert witnesses and to cross-examine the Commonwealth's witnesses in that proceeding. See *Commonwealth* v. *Repoza*, 28 Mass. App. Ct. at 326. (It is undisputed that the defendant also obtained funds to conduct his own analysis of the jacket. Contrast *Commonwealth* v. *Olszewski*, 401 Mass. 749, 754 [1988], *S.C.*, 416 Mass. 707 [1993], cert. denied, 513

U.S. 835 [1994].) Next the trial judge ruled that the "exculpatory value of the lost exhibits is in some cases questionable, in others is heightened by their loss and in still others can be replicated by stipulations or instructions." Finally, the judge determined that "the defendant, having had no hand whatsoever in the exhibits' loss, is entitled to the benefit of whatever doubt the jury's inability actually to visualize the exhibits or a particular exhibit might raise. An appropriate instruction to that effect will be given at the conclusion of the trial." The judge did not discuss whether any of the lost exhibits was material.

In the course of the trial, the missing evidence was addressed by reference to what witnesses had seen or testified to at the first trial, which was referred to as "a prior hearing." Accordingly, during the testimony of the first witness (the victim), the judge instructed the jury that:

> "[i]n every criminal case . . . indeed in every civil case . . . before the case actually comes . . . to trial, there are likely to be a whole series of hearings on all kinds of different aspects of the matter; and those hearings take place; [you have seen] and heard the reference to hearings in this case, those hearings have no bearing on what we are about right now; and you're not to speculate or to wonder or to concern yourselves in any way, shape, or form with what went on at those prior hearings.
>
> "Your function is to listen to the testimony that's presented here and the evidence that's admitted here and to understand by way of background, that it is a normal process in virtually all cases for hearings of one kind or another to take place before the trial itself actually begins; and that's what you're seeing a reflection of when you hear counsel refer to a prior hearing."

At the conclusion of the trial, the judge instructed the jury as follows:

> "You heard some testimony about exhibits that were present at another hearing and no longer are available and were not, in fact, presented here. The Commonwealth has not produced physical exhibits which have been testified to as having been presented at an earlier hearing. . . .
>
> "If there is a dispute as to the description or any other

physical characteristic of that missing physical evidence, and if your collective inability actually to look at that evidence raises in your mind a doubt about the actual description of what it was that the witnesses were talking about or raises in your mind a doubt as to any other physical attribute or characteristic of that evidence, then you must resolve that doubt in favor of the Defendant. You must follow that instruction and resolve that doubt under those circumstances in the Defendant's favor."

We now turn to an analysis of the missing evidence, the degree of prejudice to the defendant in its loss, and its materiality according to the principles set out above. See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 412 (1991). We consider the evidence in some detail in order to evaluate carefully the impact of the missing evidence on the defense, especially in view of our observation in the defendant's appeal of his first conviction that "[t]he physical and circumstantial evidence pointing to the defendant was not overwhelming." *Commonwealth* v. *Rodriguez*, 6 Mass. App. Ct. 738, 740 (1978), *S.C.*, 378 Mass. 296 (1979).

a. *The array.* The victim's opportunities to see her attacker were limited. A man passed her while she waited for a traffic light to cross Route 9 around 11:15 P.M. on September 27, 1976. She did not see his face. She saw him again standing under a street light one and one-half blocks ahead of her. Next she heard someone following her. Eventually the man attracted her attention by saying "hey" to her. When she turned around, the man was about ten feet away. She watched as he came directly up to her so that he was about a foot away. There were street lights half a block away in each direction, and the houses behind her had their porch lights on. After attracting her attention, the man put a broken bottle under her neck, pinned her arms against her, and said, "If you scream, I'll kill you." At that point his body was behind her and he pushed her into the corner of a nearby backyard, which was wet from recent rain. After insisting that she keep her eyes closed, he took his jacket off and wrapped it around her head. The assailant was "propped on his knees above [her]" as he raped her.

After the rape, the victim walked the short distance to her home. Another resident of the house called the police almost immediately upon opening the door. A police officer arrived a short time later. According to the police officer's testimony, the

victim described her assailant in the following terms. He was of "Spanish extraction," in his early twenties, about five feet, eight inches tall with a thin, muscular build. He had a mustache, his hair was in a long "Afro," and he wore wire rimmed glasses and a blue jacket, possibly suede. (The victim testified that she also described the jacket as having zippers down the front and on the breast pockets, the eyeglasses as being tinted, and the attacker's skin color as "darker than a white person's skin would be, but . . . not as dark as a black person's skin would be.") The victim told the police she did not think she could identify the defendant from a photograph but she thought she could identify him by his accent.

The officer then telephoned the station, and a second officer, a detective, arrived shortly thereafter with a stack of eight black and white photographs, which the officers described as young Hispanic males who were light-skinned with Afro-styled hair. The facial characteristics varied, except for two that were quite similar. The victim selected those two photographs. She said one was too dark and the other one, a photograph of the defendant, looked most like her attacker. She said the hair and the mustache were right, but she could not positively identify him as her attacker. The defendant was not wearing glasses in that photograph.

The next morning the detective visited the victim again, having added two more photographs to the eight the victim had seen the night before. The detective testified that the two additional photographs were light-skinned, Hispanic-looking men with Afro hair styles. The victim again identified the photograph of the defendant as being most like the person who attacked her, and said that after thinking about it all night she was "more certain," although she "couldn't be positive from a photograph." The detective considered all the men to have curly hair, but admitted some had curlier hair than others and some had hair not as curly. On cross-examination, the police officers agreed that there probably were photographs of some "black people" in the array, and that they probably didn't all have long Afros.

A month later, on the morning of the probable cause hearing, while the victim was meeting with the prosecutor at the Brookline District Court, the victim recognized a man as he walked by the window of the prosecutor's office with two other men. Apparently she said nothing about what she had seen. Later, when the prosecutor told her that she would be asked to

look around and see if she recognized anyone at the probable cause hearing, the victim told the prosecutor she had already seen the person who raped her. She subsequently made a positive identification at the probable cause hearing, and again at the 1977 trial. At the second trial ten years later, she identified the defendant again.

On appeal, the defendant argues that the loss of the photographic array "was devastating to his ability to present his defense of misidentification." The argument is based on a claim that the array was suggestive. However, the adequacy of the identification procedures was squarely before this court and the Supreme Judicial Court in the first appeal. Both courts concluded there was "no constitutional infirmity in the police procedures employed." *Commonwealth* v. *Rodriguez*, 378 Mass. at 305. When the array was before us in the defendant's first appeal, we concluded that "there was nothing about that array . . . which casts any doubt on the [first trial] judge's finding that '[t]he photographic display was in no way suggestive.' " *Commonwealth* v. *Rodriguez*, 6 Mass. App. Ct. at 747. See *Commonwealth* v. *Vasquez*, 11 Mass. App. Ct. 261, 265-266 (1981).

Of course the defendant may nevertheless argue to the jury that the array was suggestive. See *Commonwealth* v. *Rodriguez*, 378 Mass. at 308. His argument is that the suggestive array led to the more certain in-person identification at the probable cause hearing a month later, thus infecting the entire identification process. The defendant finds support for this assertion in the argument of trial counsel at the hearing on the motion to suppress preceding the first trial. At that time, defense counsel apparently argued that "it's obvious from the photographs, half are blacks. There are whites with slicked down hair, only one person, reasonably fitting the description [of the defendant]." According to the defendant's brief, first trial counsel argued to the jury in closing that "there is only one Hispanic with a true Afro. And there may be a couple of Hispanics with curly hair; but there is only one that fits the description." (The victim, at least, thought two of the photographs looked similar.) See generally *Commonwealth* v. *De La Cruz*, 405 Mass. 269, 272-273 (1989); *Commonwealth* v. *Long*, 419 Mass. 798, 807 n.9 (1995).

In fact, the defendant's lawyers had different opinions as to the effectiveness of using the array defensively. Assuming for the purpose of argument that the defendant's photograph was

recognizably different from the others in the array, would it be more effective to show the array to the jury and claim it was unfair and suggestive, or, especially considering that the victim's identification was tentative, better to suppress the array and confine the evidence to the fact that the victim did not make a firm identification? After discovering that the array was missing, second trial counsel and present appellate counsel (neither of whom saw the array) argued strenuously for the first approach, insisting that the array was essential because it was suggestive and therefore exculpatory. However, in the fall of 1979, first trial counsel (who did see the array), in anticipation of a retrial following reversal of the defendant's first conviction, argued that the array should be excluded. He argued that "[t]he Commonwealth is able through testimony to elicit all evidence concerning the selection of the defendant's pictures without . . . introducing the photographs themselves." See *United States* v. *Picariello*, 568 F.2d 222, 228 (1st Cir. 1978) (evidence not considered essential until discovery that it had been destroyed). Such strategic choices are not generally a basis for constitutional challenge. See *Commonwealth* v. *Amirault*, 424 Mass. 618, 645 (1997) ("experienced and competent counsel might well have concluded that it was to the defendants' advantage to keep the emotional temperature as low as possible by not insisting on confrontation"). Cf. *Commonwealth* v. *Lamontagne*, 42 Mass. App. Ct. 213, 221 (1997) (ineffective assistance of counsel claims). The defendant has not established that the array "would have produced evidence favorable to his cause." *Commonwealth* v. *Neal*, 392 Mass. at 12.

Moreover, even were we to agree that the loss of the array may have been exculpatory and therefore prejudicial, the defendant has not established that the evidence was material. *Commonwealth* v. *Otsuki*, 411 Mass. at 231. The defendant forcefully established that he was sixteen years old at the time of his arrest, not in his mid-twenties as the victim described, that the Commonwealth did not attempt a voice identification or conduct more reliable and available identification procedures, such as a lineup or identikit, and that perhaps the photographs did not all look like the defendant. Indeed, the prosecutor acknowledged in her closing argument that there was a range of skin colors in the array. Defense counsel also argued that the defendant did not have an accent as the victim described, a trait that surely was not affected by the loss of the evidence. We do

not believe that the array would have created a reasonable doubt that did not otherwise exist. *Ibid.* See *Commonwealth* v. *Kater*, 432 Mass. 404, 420-421 (2000).

b. *The defendant's jacket.* As indicated above, the victim described her assailant as wearing a blue suede-like jacket. She also testified that the jacket "zippered in the front, and it had pockets. There were . . . breast pockets on the jacket and there were zippers on them." She said that during the rape her attacker took his jacket off and put it over her face and that the lining of the jacket was quilted.

On the day after the rape, pursuant to a warrant, the police searched the room the defendant had moved into earlier on the evening of the rape. They found a "dark green" jacket with "a zipper up the front and . . . two exposed zippers in the breast area." The jacket was wet and particularly muddy near the elbows. There was blood on the front of the jacket as well as on the lining "in the lumbar portion, the very bottom of the jacket in the back." At the second trial, the parties stipulated that both the defendant and the victim had "type O" blood. The blood on the lining of the jacket was of that type, which, as the prosecutor pointed out in closing argument, was consistent with the victim's description of the way in which the assailant put the jacket over her face and the fact that she was bleeding at the neck from cuts from the broken bottle. On the front of the jacket, in addition to type O blood, there was also type A. (The defendant testified that he had been in a fight with another man a week before the rape.) Upon being shown the jacket at the first trial, the victim admitted that it was green and not blue, but she testified that it was otherwise like the jacket her assailant had been wearing. The victim described the street lights under which her attacker was standing as "fluorescent . . . giv[ing] like blue [light]."

On appeal, the defendant argues that the discrepancies between the victim's description of the jacket and the appearance of the jacket found in the defendant's room — its color, and arguably its fabric and precise zipper arrangement — were exculpatory. (The State police chemist described the jacket as being "green velour-type.") However, in its decision on the defendant's appeal from his 1977 conviction, the Supreme Judicial Court noted that the "green suede jacket" was similar to the jacket described in the warrant. *Commonwealth* v. *Rodriguez*, 378 Mass. at 304. In reviewing the evidence, the court

also reported that the jacket matched the victim's description. *Id.* at 300. It is therefore unlikely that the jacket would have proved to be exculpatory. Indeed, the Commonwealth described the impact of the jacket's loss on its case as "devastating." (Other items of lost evidence that are not at issue in this appeal are the victim's corduroy pants, which a police officer testified he found in bushes along the most direct route from the scene of the rape to the defendant's lodging, and the eyeglasses the defendant was wearing at the time of his arrest. At the second trial, the victim described the eyeglasses and testified to her memory that the glasses she saw at the first trial were similar to those worn by her attacker.)

The cases concerning lost evidence on which the defendant depends are clearly distinguishable. In the first instance, they all concern the pretrial loss of evidence. Such loss prevents a defendant from examining the evidence himself. Here, not only was the evidence available to the defendant prior to trial, he obtained funds to conduct his own analysis of the jacket. Contrast *Commonwealth* v. *Olszewski*, 401 Mass. at 754. He also cross-examined the Commonwealth's witnesses. At the second trial, the defendant was able to use both the transcript of the first trial and the laboratory reports. See *Commonwealth* v. *Repoza*, 28 Mass. App. Ct. at 326.

By contrast, in *Commonwealth* v. *Olszewski, supra,* the Commonwealth was responsible for the pretrial loss of evidence, and the loss precluded the defendant from rebutting the Commonwealth's use of the fruits of its investigation. *Id.* at 752, 756. In *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15 (1993), we held that the Commonwealth's conduct (authorizing the destruction of an aborted fetus in a case where the teenage victim disclosed the alleged rape upon discovering she was pregnant) was grossly negligent, bordering "perilously close to supporting an inference of bad faith." *Id.* at 24. *Commonwealth* v. *Tucceri*, 412 Mass. 401 (1992), is simply not on point. In that case, the Commonwealth failed to disclose clearly exculpatory evidence in its possession, which was neither lost nor destroyed. Nor is *Commonwealth* v. *Susi*, 394 Mass. 784 (1985), on point. In that case, the court held that the judge should have allowed the defendant's challenge of a blind juror for cause because "[a] mere description of the physical evidence [could not convey] adequately the subtleties which would be apparent [to sighted jurors] on a visual comparison." *Id.* at 788. Here,

however, the jurors in the second trial were able to compare the victim's description with the appearance of the defendant at the time of the offense through the admission of the arrest photographs, which had not been introduced at the first trial.

There was no abuse of discretion in the judge's determination of the appropriate remedies for the lost evidence in this case. See *Commonwealth* v. *Harwood*, 432 Mass. at 302. He protected the defendant's rights by allowing reference to prior testimony, limiting the introduction of certain evidence, and instructing the jury that the defendant was to have the benefit of any doubt. In this case, the loss of evidence was not "so critical to the defense as to make a criminal trial fundamentally unfair." Contrast *Commonwealth* v. *Henderson*, 411 Mass. 309, 311 (1991), quoting from *Arizona* v. *Youngblood*, 488 U.S. 51, 61 (1988) (Stevens, J., concurring). Finally, having found no error in the judge's denial of the defendant's motion to dismiss, we conclude there is no merit to his alternative argument that his counsel was ineffective in failing to rely more heavily on the transcript of the first trial in support of the motion. Compare *Commonwealth* v. *Vieux*, 41 Mass. App. Ct. 526, 535 (1996), cert. denied, 520 U.S. 1245 (1997).

2. *Refusal evidence.* Over the defendant's objection, a detective testified at the second trial in 1987 that shortly after the rape in 1976, he had asked the defendant to provide a sample of his pubic hair. The defendant accepted the envelope and·the comb, waited a short time, and then returned the envelope empty to the detective. The detective repeated his request and watched while the defendant provided the requested sample. Five years after the second trial, and five years before the appeal was finally docketed in this court, the Supreme Judicial Court held that admission of refusal evidence is a violation of art. 12 of the Massachusetts Declaration of Rights. *Commonwealth* v. *Lydon*, 413 Mass. 309, 313-315 (1992). Relying on the retroactive application of *Lydon*, see *Commonwealth* v. *D'Agostino*, 421 Mass. 281, 284 (1995), the defendant claims that the introduction of the evidence was reversible error. We disagree.

First, it is unclear that the delay in providing the evidence constituted a refusal. The defendant did in fact provide the requested sample. But even were we to conclude that the evidence of the delay was testimonial because the jury could have inferred from his initial failure to comply with the request that the defendant thought the sample might incriminate him,

see *Commonwealth* v. *Conkey*, 430 Mass. 139, 142 (1999), any error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983), and *Commonwealth* v. *Rosario*, 430 Mass. 505, 511 & n.6 (1999), discussing factors to consider in determining whether constitutional error is harmless.

After the "refusal" evidence at issue here, the defendant's pubic hair sample was never mentioned again during the trial. At the first trial "[t]he police chemist testified that the color of certain hairs found in the crotch of the underpants worn by the defendant when he was arrested . . . was consistent with the color of a sample of [the victim's] pubic hair . . . and inconsistent with the color of a sample of the defendant's pubic hair." *Commonwealth* v. *Rodriguez*, 6 Mass. App. Ct. at 741. However, at the second trial, the judge excluded this testimony on the ground that the expert's opinion was "more confusing to the jury and less helpful than having the jury proceed without that testimony." The ruling on this testimony did not occur, however, until after a voir dire toward the end of the expert's testimony. Thus, after the earlier "refusal" testimony, there was simply no further mention of the defendant's pubic hair from any witness, from the prosecutor in closing argument, or from the judge in his instructions. Contrast *Commonwealth* v. *Hinckley*, 422 Mass. 261, 267 (1996) (refusal evidence particularly persuasive when reinforced by prosecutor's argument and judge's instructions). Moreover, there was no specific evidence before the jury that would have indicated to them what the incriminating risk in providing the pubic hair might have been, e.g., there was no testimony of finding pubic hair in the clothing, underwear, or at the crime scene. Contrast *Commonwealth* v. *Lydon*, 413 Mass. at 311 (refusal to allow test of hands for gunpowder where murder weapon was a gun); *Commonwealth* v. *McGrail*, 419 Mass. 774, 777, 780 (1995) (refusal to perform field sobriety test); *Commonwealth* v. *Hinckley, supra* at 262, 264 (failure to turn over sneakers in investigation where shoe prints in vicinity of crime site at issue); *Commonwealth* v. *Conkey*, 430 Mass. at 143 (failure to provide finger prints after agreeing to do so). In a five-day trial, a few lines of testimony to which no one referred again, particularly when in fact the defendant did comply, was harmless beyond a reasonable doubt. See *Commonwealth* v. *Vermette*, 43 Mass. App. Ct. 789, 797-798 (1997). (Having reached this conclusion, we need not reach

the Commonwealth's argument that a defendant who fails to diligently pursue his appeal ought not be able to claim retroactive application of a new decision.)

3. *Past recollection recorded.* At the second trial, the victim testified that she could not remember the fabric of the jacket her assailant was wearing. She was shown her testimony from the previous trial ten years earlier. After reviewing the transcript, the victim testified that she remembered giving the testimony but still had no independent current memory of the jacket fabric. The Commonwealth was permitted over objection to introduce the victim's prior testimony from the transcript of the 1977 trial as to the material of the jacket — "I thought it was a suede material" — as past recollection recorded. At trial, the defendant explicitly did not question the authenticity of the transcript. Instead, he objected to the introduction of the testimony in the absence of the jacket itself. On appeal, the defendant claims that the testimony at issue here does not meet the standard for admission as past recollection recorded. We address his contention because arguably he preserved the issue when he referred to his "foundational objections" at trial.

A statement is admissible as past recollection recorded if four conditions are met: "(1) the witness has no revivable recollection of the subject, (2) the witness had firsthand knowledge of the facts recorded, (3) the witness can testify that the statement was truthful when made, and (4) the recording was made when the events were fresh in her memory." *Commonwealth* v. *Nolan,* 427 Mass. 541, 543 (1998), citing *Commonwealth* v. *Bookman,* 386 Mass. 657, 663-664 (1982). "The predominant concern, apart from the necessity and circumstantial trustworthiness elements common to all hearsay exceptions, . . . is the accuracy of the record of past recollection . . . ." *Commonwealth* v. *Galvin,* 27 Mass. App. Ct. 150, 152 (1989) (citation omitted).

Here the trial judge concluded that the testimony was:

> "the substantial equivalent of . . . past recollection recorded . . . . There hasn't been any testimony that the witness reviewed the transcript at or near the time the transcript was prepared, but the witness now says she recalls saying what's in the transcript then and that it is accurate; and that her memory then was accurate. Therefore, I think the substantial equivalent of the past recollection recorded . . . [a]n exception has been set out. . . ."

There was no error in the admission of the victim's prior testimony.

4. *Consciousness of guilt.* The defendant argues that it was error for the judge to instruct the jury on consciousness of guilt when his defense was mistaken identity. There is no inconsistency here. The defendant spoke to police the day after the rape and also testified at trial. If the jury determined that the defendant's statements and testimony were false, they could consider that lack of credibility as evidence of consciousness of guilt in their deliberations. The Commonwealth's closing argument as it pertains to consciousness of guilt concerned the victim's testimony that she smelled alcohol and cigarettes on the breath of the person who raped her and the evidence that the ground where the rape occurred was wet. As to these details, the defendant testified that his visit to a liquor store and request for beer were not an attempt to buy beer but an excuse to find a better telephone. His statement to police that he did not get wet on the night of the rape was in direct conflict with the evidence the police discovered on executing a search warrant of the defendant's room the day after the rape — a jacket fitting the victim's description with wet elbows and a pair of denim pants with wet knees. In a case that depended on credibility, the jury were entitled to consider whether the defendant's explanations rang true. As in *Commonwealth* v. *Mitchell,* 20 Mass. App. Ct. 902 (1985), which the defendant cites in support of his argument, there was other evidence tying the defendant to the rape. (We also note that, while it arguably would have been permissible, the Commonwealth did not introduce evidence of the defendant's default as consciousness of guilt. See *Commonwealth* v. *Oeun Lam,* 420 Mass. 615, 617-618 [1995]; *Commonwealth* v. *Goldoff,* 24 Mass. App. Ct. 458, 465-466 [1987].)

*Conclusion.* The defendant has also filed his own "pro se brief pursuant to *Commonwealth* v. *Moffett,* 383 Mass. 201 (1981)." We have reviewed its many arguments and find no merit in any of them. Indeed some were decided in his first appeal.

*Judgments affirmed.*